FILED
2022 Feb-14  PM 03:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **LATARRA WILSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:19-cv-448-AMM** |
| | ) |
| **MARK PETTWAY,** *in his Official* | ) |
| *Capacity as Sheriff of Jefferson* | ) |
| *County, Alabama,* | ) |
| | ) |
| **Defendant.** | ) |

## <u>MEMORANDUM OPINION ON DEFENDANT SHERIFF MARK PETTWAY'S MOTION FOR SUMMARY JUDGMENT</u>

This case is before the court on the Defendant Sheriff Mark Pettway's Motion for Summary Judgment. Doc. 35. For the reasons explained below, Sheriff Pettway's motion is **GRANTED**.

## I.      BACKGROUND

The Replacement Initial Order provides that "[t]he parties' submissions in support of and opposition to summary judgment motions must consist of . . . a brief containing . . . a statement of allegedly undisputed relevant material facts (or rebuttal to such statement, for an opposition filing)." Doc. 18 at 15–16. That order further provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." *Id.* at 18.

Plaintiff LaTarra Wilson's opposition did not dispute any statement of facts asserted alleged in Sheriff Pettway's motion for summary judgment. *See* Doc. 38.

The facts material to Sheriff Pettway's motion, viewed in the light most favorable to Ms. Wilson, are as follows:

In March 2006, Ms. Wilson was hired as a deputy sheriff for the Jefferson County Sheriff's Office ("JCSO"). Doc. 1 ¶ 17; Doc. 35-1 ¶ 3; Doc. 35-2; Doc. 37 ¶ 1. During Ms. Wilson's 11-year employment with the Jefferson County Sheriff's Office, Internal Affairs investigated her at least seven times for violating JCSO policies and procedures. Doc. 35-3; Doc. 37 ¶ 2. This lawsuit arose from an incident in 2016 in which Ms. Wilson "violat[ed] multiple JCSO policies and procedures and Personnel Board of Jefferson County ("PBJC") rules and regulations, including making false statements." Doc. 35-10 at 7–9; Doc. 37 ¶ 7.

According to Sheriff Pettway, those violations, "along with [Ms. Wilson's] prior extensive disciplinary history," resulted in a recommendation for Ms. Wilson to be terminated from her position as a deputy sheriff. Doc. 35-10 at 7–9; Doc. 37 ¶ 7. In lieu of termination, JCSO "allowed [Ms.] Wilson to voluntarily resign;" Ms. Wilson "submitted her resignation letter on March 3, 2017." Doc. 35-1 ¶ 11; Doc. 35-12; Doc. 37 ¶ 8. "After accepting her resignation, the JCSO was required to submit a Termination Personnel Action Form ('PAF') to the PBJC," which form "required the JCSO to indicate a rehire recommendation and a standing code." Doc.

35-1 ¶ 11; Doc. 35-13; Doc. 37 ¶ 8. The JCSO provided that it "would not rehire [Ms.] Wilson and . . . that she left in 'neutral' standing." Doc. 35-1 ¶ 12; Doc. 37 ¶ 8.

Ms. Wilson did not submit a statement of facts in connection with her opposition to Sheriff Pettway's motion for summary judgment. *See* Doc. 38. Her complaint alleges that the JCSO discriminated against her "because of [her] race" and "because she participated in the protected activity of complaining of racial discrimination." Doc. 1 ¶¶ 46, 48. Specifically, Ms. Wilson alleges that she was placed on a five-day, paid administrative leave in February 2017, "pending the outcome of an internal investigation," and that the JSCO sought "to extend th[at] administrative leave with pay [for] another five (5) days" because the investigation was not yet complete on March 1, 2017. *Id*. ¶¶ 49–50. Further, Ms. Wilson alleges that she "was offered the option to voluntarily resign or . . . could wait on the results of the pending internal investigation." *Id*. ¶ 51.

Ms. Wilson alleges that, during the time she was on administrative leave, "she had multiple conversations with [a] JCSO [s]ergeant . . . , who stated [that Ms.] Wilson needed to make a decision regarding her resignation," but that her "resignation would have no impact on her seeking gainful employment . . . within the Jefferson County Merit System." *Id*. ¶ 52. Ms. Wilson further alleges that her attorney was told by the JCSO attorney "that it was best for [Ms.] Wilson to resign,"

3

and that "resignation would not prevent her from being placed back on the Eligibility List [with the PBJC] and seeking future employment within the Merit System of the PBJC." *Id.* ¶¶ 54–55. Ms. Wilson alleges that, "[b]ased on the declarations by [the JCSO attorney,]" her attorney "advised [her] to resign from the JCSO." *Id.* ¶ 56. Ms. Wilson further alleges that her "decision to resign was based solely on the statements made by [the sergeant and JCSO attorney] . . . regarding her ability to be reinstated . . . with the PBJC to seek employment . . . within the Jefferson County Merit System." *Id.* ¶ 59.

Ms. Wilson alleges that, in early March, she "turned in her letter of resignation." *Id.* ¶ 57. Further, Ms. Wilson alleges that, after her resignation, she "submitted a request for reinstatement to seek employment in her previous class of Deputy Sheriff to the PBJC." *Id.* ¶ 58. Ms. Wilson alleges that she "was notified via email by . . . a Business Systems Specialist for the PBJC . . . that her request for reinstatement . . . could not be approved because the records PBJC had received from JCSO reflected that she did not separate from the JCSO in 'good standing' pursuant to PBJC [r]ule[s]." *Id.* ¶ 61. Ms. Wilson alleges that she "was notified that due to JCSO coding her separation as a classification of . . . 'neutral standing' . . . she was ineligible to be reinstated." *Id.* ¶ 62.

Ms. Wilson alleges that "a similarly situated Caucasian male [d]eputy, Josh Freeman, was allowed to resign in 'good standing' despite being investigated for

theft," and that "[o]ther similarly situated Caucasian [d]eputies have also been allowed to resign in 'good standing' despite being under investigation at the time of their resignation." *Id.* ¶¶ 65–66. Accordingly, Ms. Wilson asserts racial discrimination claims against Sheriff Pettway pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.*, ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981").

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the party moving for summary judgment establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party has carried its burden, Rule 56 requires that the nonmoving party "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324–25; *see also* Fed. R. Civ. P. 56(c)(1)(A). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute if a reasonable jury could return a verdict in favor of the nonmoving party. *Id.*

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III.   ANALYSIS

Ms. Wilson sued Sheriff Pettway, the sole remaining defendant, only "in his official capacity as Sheriff of Jefferson County, Alabama." Doc. 1 at 1; *id*. ¶ 8. The claims asserted against Sheriff Pettway are for racial discrimination under Title VII and Section 1981, which are the only claims that remain pending in this lawsuit. *Id*. at 9–12. Sheriff Pettway is entitled to summary judgment against Ms. Wilson's Section 1981 claim because 42 U.S.C. § 1983 ("Section 1983") provides the exclusive remedy for a violations of Section 1981 by a state actor, and on the separate and independent basis of sovereign immunity. Sheriff Pettway is entitled to summary judgment against Ms. Wilson's Title VII claim because Ms. Wilson failed to establish a *prima facie* case of discrimination.

### A. Sheriff Pettway is entitled to summary judgment against Mr. Wilson's Section 1981 claims on two separate and independent grounds.

Sheriff Pettway is entitled to summary judgment against Ms. Wilson's Section 1981 claims first because Section 1983 is the exclusive remedy for the violations Ms. Wilson asserts. Sheriff Pettway asserts that, "as a state actor," he "is due summary judgment on [Ms.] Wilson's [Section] 1981 claim" because Section 1983

"provides the exclusive remedy for violations against state actors sued in their official or individual capacities." Doc. 37 at 14. Ms. Wilson does not contest that assertion and does not suggest that Sheriff Pettway was on notice of a claim under Section 1983 even though she did not plead one. *See* Doc. 38; *cf. King v. Butts Cnty.*, 576 F. App'x 923 (11th Cir. 2014).

In support of his assertion that Section 1983 provides the exclusive remedy for Ms. Wilson's Section 1981 claims, Sheriff Pettway cites *Williams v. Ala. Dep't of Corrs.*, No. 2:13-CV-606-WKW, 2014 WL 2968457 (M.D. Ala. July 2, 2014), as persuasive authority. Doc. 37 at 14. In *Williams*, the district court held that "[w]here a plaintiff seeks vindication of rights secured by [Section] 1981 against a state actor, [Section] 1983 provides the exclusive remedy for obtaining relief." 2014 WL 2968457, at *3 (citing *Butts v. Cnty. of Volusia*, 222 F.3d 891 (11th Cir. 2000)). In *Butts*, the Eleventh Circuit concluded that Section 1981 does not provide a cause of action against state actors because the Supreme Court held in *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), that "[Section] 1983 constitutes the exclusive remedy against state actors for violations of the rights contained in [Section] 1981." *Butts*, 222 F.3d at 892–93. The Eleventh Circuit further held that "[n]othing in the 1991 amendment to [Section] 1981 evinces Congress' desire to alter the Supreme Court's conclusion in *Jett*." *Id*. at 894. Accordingly, the *Butts* court held that "[t]he district court correctly granted [the defendant's] motion for summary

judgment[,]" which was "based on the argument that [Section] 1981 does not provide a cause of action against state actors," and affirmed its holding that "a plaintiff must use the remedial provisions of [Section] 1983 to enforce against state actors the rights created by [Section] 1981." *Id.* at 892, 895.

Under Alabama law, Sheriff Pettway is a state actor. *See infra* at pp. 9–10. Ms. Wilson asserts a Section 1981 claim against Sheriff Pettway, Doc. 1 ¶¶ 46–66, but does not assert a Section 1983 claim against Sheriff Pettway, nor does she mention Section 1983 anywhere in her complaint, *see id*. Further, Ms. Wilson does not suggest that Sheriff Pettway was on notice of a claim under Section 1983 even though she did not plead one. *Cf. King*, 576 F. App'x 923.

Based on binding precedent, Sheriff Pettway's motion for summary judgment against Ms. Wilson's Section 1981 claim is **GRANTED** because Section 1983 provides the exclusive remedy for alleged violations of Section 1981 by a state actor.

Separately, Sheriff Pettway is entitled to summary judgment against Ms. Wilson's Section 1981 claim on sovereign immunity grounds. "The Eleventh Amendment provides sovereign immunity to the states to protect them from suit in federal court without their consent," and such "immunity has also been extended to state officials, acting in their official capacity, where an agency or individual may be treated as an arm of the State partaking of the Eleventh Amendment Immunity." *Melton v. Abston*, 841 F.3d 1207, 1233 (11th Cir. 2016) (cleaned up). Accordingly,

"[a] state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity or Congress has abrogated the state's immunity." *Id*.

Congress has abrogated states' sovereign immunity from Title VII claims. *See In re Emp. Discrimination Litig. Against State of Ala.*, 198 F.3d 1305, 1317 (11th Cir. 1999) ("[W]e have no hesitation in concluding that Congress unequivocally expressed its intent to abrogate the states' Eleventh Amendment immunity when it amended Title VII to cover state and local governments."). But Congress "has not abrogated Alabama's immunity and Alabama has not waived its Eleventh Amendment immunity [from Section 1983 claims,]" *Melton*, 841 F.3d at 1234, nor has Congress abrogated sovereign immunity from Section 1981 claims, *see Henry v. Fla. Bar*, 701 F. App'x 878, 880 (11th Cir. 2017) (citing *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1069 (5th Cir. 1981)). Accordingly, "Alabama state officials are immune from [Sections 1981 and 1983] claims brought against them in their official capacities," *Melton*, 841 F.3d at 1234 (emphasis omitted); *see also Henry*, 701 F. App'x at 880; *Sessions*, 648 F.2d at 1069.

When determining "whether a state official is protected by Eleventh Amendment immunity," courts in this circuit "consider the laws of the state in question." *Melton*, 841 F.3d at 1234. The Constitution of Alabama provides that "[t]he executive department shall consist of . . . a sheriff for each county." Ala.

Const. art. V, § 112. The Supreme Court of Alabama has held that, "[a]s an executive officer, a sheriff is immune from being sued in the execution of the duties of his office under Art. I, § 14, Alabama Const.1901."[1] *Ex parte Haralson*, 853 So. 2d 928, 932 (Ala. 2003).

Because the Eleventh Circuit has held that "[i]t is well established in this Circuit that Alabama sheriffs and their deputies are state officials and are absolutely immune from suit as an officer of the state under the Eleventh Amendment," *Melton*, 841 F.3d at 1234, the court finds that Sheriff Pettway is "immune from suit under the Eleventh Amendment for [Ms. Wilson's] claims brought against [him] in [his] official capacity as [a] state official[]." *Id.*

Accordingly, Sheriff Pettway's motion for summary judgment against Ms. Wilson's Section 1981 claim is **GRANTED** for the additional reason that Sheriff Pettway is entitled to sovereign immunity under the Eleventh Amendment.

### B. Sheriff Pettway is entitled to summary judgment against Ms. Wilson's retaliation and discrimination claims under Title VII because Ms. Wilson failed to establish a *prima facie* case.

#### 1. Retaliation Claim

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed

---

[1] "[T]he State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. art. I, § 14.

any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "To make a *prima facie* case for a claim of retaliation under Title VII, a plaintiff must first show (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (cleaned up).

Sheriff Pettway asserts that Ms. Wilson "has not alleged a claim cognizable under Title VII" because "she is complaining about treatment she received from a **former** employer" that allegedly "classified her as having departed in 'neutral' standing, instead of . . . 'good' standing." Doc. 37 at 7 (emphasis added) (internal quotation marks omitted). But Sheriff Pettway concedes that, "theoretically[,] an aggrieved employee may assert a 'retaliation' claim against a former employer under Title VII." *Id.* (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) ("[W]e hold that former employees are included within [Title VII's] coverage.")).

Sheriff Pettway asserts that Ms. Wilson failed to establish a retaliation claim under Title VII because "[t]he [c]omplaint references 'retaliation' twice in two boiler plate places without any details." Doc. 37 at 7–8; *see also* Doc. 1 ¶ 11; *id*. at 17. Ms.

Wilson's response does not contest this assertion, nor does it mention any claim for retaliation under Title VII. *See* Doc. 38.

Ms. Wilson's complaint alleges that Ms. Wilson "brings this action for the . . . act[] of intentional . . . retaliation that occurred at the JCSO," Doc. 1 ¶ 11, and requests "an order enjoining Defendants and all persons acting in concert with Defendants from engaging in . . . retaliatory employment practices," *id*. at 17. The single count asserted against Sheriff Pettway makes the allegation that Ms. Wilson was "discriminated against . . . because she participated in the protected activity of complaining of racial discrimination." *Id*. ¶ 48. But nowhere in Ms. Wilson's complaint does she describe her engagement in any statutorily protected activity, nor does she allege that she suffered an adverse action that was causally related to such protected activity. *See Gogel*, 967 F.3d at 1134. Further, Ms. Wilson's response to Sheriff Pettway's motion for summary judgment fails to point to any evidence that would support a retaliation claim. *See* Doc. 38.

Because Ms. Wilson has failed to present any evidence to create a genuine issue of material fact as to a claim for retaliation under Title VII, Sheriff Pettway's motion for summary judgment against that claim is **GRANTED**.

### 2. Discrimination Claim

Title VII provides that "[i]t shall be an unlawful employment practice for an employer (1) . . . to discharge any individual, or otherwise to discriminate against

any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

"In order to survive summary judgment, a plaintiff alleging intentional discrimination [under Title VII] must present sufficient facts to permit a jury to rule in her favor," and can do so in three ways. *Lewis v. City of Union City*, 918 F.3d 1213, 1220 & n.6 (11th Cir. 2019). "One way that she can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas*." *Id*. "A plaintiff can also present direct evidence of discriminatory intent, . . . or demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination . . . ." *Id*. at 1220 n.6.

Ms. Wilson attempts to survive summary judgment by satisfying the *McDonnell Douglas* standard. *See* Doc. 1 ¶¶ 46–66 ("[A] similarly situated Caucasian male[,] Deputy[] Josh Freeman, was allowed to resign in 'good standing' despite being investigated for theft."); Doc. 38 (responding in opposition only to Sheriff Pettway's assertion that Mr. Freeman is not a valid comparator).

"When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21. "If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221. "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Id.* (cleaned up).

To establish the fourth element of a *prima facie* case of discrimination, the plaintiff "must show that [they] and [their] comparators are 'similarly situated in all material respects.'" *Id.* at 1226; *see also Knox v. Roper Pump Co.*, 957 F.3d 1237 (11th Cir. 2020). This standard must be applied "on a case-by-case basis, in the context of individual circumstances." *Lewis*, 918 F.3d at 1227. "Ordinarily, . . . a similarly situated comparator . . . will have engaged in the same basic conduct (or misconduct) as the plaintiff . . . ; will have been subject to the same employment policy, guideline, or rule as the plaintiff . . . ; will ordinarily (although not invariably)

have been under the jurisdiction of the same supervisor as the plaintiff . . . ; and will share the plaintiff's employment or disciplinary history . . . ." *Id.* at 1227–28 (internal citations omitted). It is not "necessary for a plaintiff to prove purely formal similarities—*e.g.*, that [they] and [their] comparators had precisely the same title[,] . . . [n]or will minor differences in job function disqualify a would-be comparator." *Id.* at 1227. Examples of "employees who are differently situated in material respects" include those "who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id.* at 1228 (cleaned up). "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects' . . . ." *Id.*

In *Lewis*, the plaintiff, "an African-American woman" who was working as a detective for the city police department, asserted race and gender discrimination claims against the city following her termination, *id.* at 1218–20. The plaintiff suffered a heart attack a year after she was promoted to detective "but was [ultimately] cleared to return to work without any restrictions." *Id.* at 1218. Following her return, the police chief "announced a new policy requiring all officers to carry Tasers," and provided a "training associated with the new policy" that required officers to "receive a five-second Taser shock." *Id.* The plaintiff's doctor informed the police chief that she "would not recommend that either a Taser or pepper spray be used either on or near [the plaintiff]." *Id.* at 1219 (cleaned up). The

police chief "concluded that the restrictions . . . prevented [the plaintiff] from performing the essential duties of her job," and placed the plaintiff "on unpaid administrative leave." *Id*. After the plaintiff "had exhausted all of her accrued leave," but had failed to "complete[] the necessary FMLA paperwork," her absence was deemed unapproved and she was terminated pursuant to a city policy providing that unapproved leave of absences are grounds for dismissal. *Id*.

The Eleventh Circuit adopted and applied in *Lewis* a new test for determining whether the "similarly situated" requirement under *McDonnell Douglas* framework is satisfied: Are the plaintiff and her/his alleged comparator "'similarly situated in all material respects'"? *Id*. at 1226 (internal quotation marks omitted). The Eleventh Circuit found that the plaintiff in *Lewis* failed to make out a *prima facie* case of discrimination because her proffered comparators were not "'similarly situated in all material respects.'" *Id*. at 1229.

The Court observed that the plaintiff "and her comparators were placed on leave years apart and pursuant to altogether different personnel policies and . . . for altogether different conditions." *Id*. at 1230. Specifically, the comparators were placed on leave pursuant to the police department's "Physical Fitness/Medical Examinations" policy, which was not issued until two years after the plaintiff was terminated. *Id*. By contrast, the plaintiff was discharged pursuant to the city's "Personnel Policy." *Id*. Further, the comparators "flunked physical-fitness

requirements related . . . to 'balance' and 'agility,'" and "were placed on leave . . . to remedy the problems that caused their failures." *Id*. By contrast, the plaintiff "failed a training requirement . . . on the ground that she suffered from . . . a 'chronic' heart condition." *Id*. Accordingly, the court held that "because they were subject to different personnel policies and placed on leave for different underlying conditions," they "were not similar to [the plaintiff] 'in all material respects,' and thus were not valid comparators." *Id*. at 1231.

The Eleventh Circuit applied *Lewis* in *Knox v. Roper Pump Co*., 957 F.3d 1237 (11th Cir. 2020). In *Knox*, the plaintiff, "an African-American man and quality test technician [for the defendant] for fifteen years, got into a fight with his adult daughter . . . at their shared home." *Id*. at 1240. The plaintiff's daughter worked in the same facility he did, but worked for one of the defendant's "affiliated companies." *Id*. After the fight occurred, the plaintiff's daughter complained to the defendant's human resources department, and the plaintiff was suspended from work "[b]ecause violence against a coworker violated [the defendant's] workplace violence policy." *Id*.

After his suspension, the plaintiff complained to the defendant's employee ethics hotline "that he believed he was being discriminated against on account of race because white employees who had violated the workplace violence policy had been allowed to continue working." *Id*. The defendant then told the plaintiff that "he

could keep his job if he completed anger management classes while on unpaid leave," and sent him a written Last Chance Agreement that included a release of all claims against the defendant. *Id*. at 1240, 1242. The plaintiff refused to sign the agreement unless the release was removed. *Id*. at 1240. The defendant refused to remove the release and fired the plaintiff. *Id*. Following his termination, the plaintiff sued the defendant and its affiliated companies for retaliation and race discrimination in violation of Title VII. *Id*. The district court granted summary judgment on the plaintiff's race discrimination claim "because [the plaintiff's] proposed comparators were not sufficiently similar," and the Eleventh Circuit affirmed. *Id*. at 1244, 1248.

The plaintiff had provided three alleged comparators—a white employee who "was not disciplined after a domestic violence incident with [his] [ex-]wife," and two other white employees who "got into a violent altercation at work and were permitted to continue working with pay while they attended anger management classes." *Id*. at 1247. The court observed that the first comparator's "ex-wife was not and had never been an employee of [the defendant] or any other . . . subsidiary" of the defendant. *Id*. Accordingly, the court found that he was not similarly situated because, "although he was involved in a domestic violence incident outside work, the altercation did not involve one of [the defendant's] employees." *Id*. The court observed that the other two comparators "were involved in a fight at work," which

"violated [the defendant's] workplace violence policy." *Id*. Unlike the plaintiff, "[b]oth men were immediately terminated[,]" and "[n]either was offered a[] [Last Chance Agreement] initially." *Id*. However, "[w]eeks after their termination," the defendant rehired them "out of business necessity" and permitted them to work "while attending anger management courses." *Id*. at 1247–48. Accordingly, the court found that "their immediate termination and subsequent rehiring out of necessity undermine [the plaintiff's] claim . . . that they were similarly situated in all material respects." *Id*. at 1248. Finally, the court observed that the incidents involving the proffered comparators "all occurred under different supervisors," which is "still another meaningful distinction." *Id*.

Bound by these legal standards, the court analyzes Mr. Wilson's proposed comparator, Mr. Freeman. Sheriff Pettway asserts that Ms. Wilson did not present a *prima facie* case of discrimination because she failed to present a valid comparator. Doc. 37 at 8–13. Specifically, Sheriff Pettway asserts that Mr. Freeman is not a valid comparator because (1) "the decisions concerning [Ms.] Wilson and [Deputy] Freeman were made years apart," (2) "[Ms.] Wilson and [Deputy] Freeman did not engage in similar misconduct," and (3) "[Ms.] Wilson and [Deputy] Freeman do not share a similar employment and disciplinary history." *Id*. at 9–12.

Ms. Wilson responds that the two-year gap between Ms. Wilson's and Mr. Freeman's resignations "is irrelevant[] for purposes of proving discrimination." Doc.

38 at 4. Ms. Wilson further asserts that, unlike in *Lewis*, where the "comparators were dismissed three and four years after [the plaintiff's] dismissal," Ms. Wilson "was dismissed two years after comparator [Deputy] Freeman." *Id*. Further, Ms. Wilson concedes that "[Ms.] Wilson and [Deputy] Freeman did not engage in the same misconduct," but asserts that "the subject of the misconduct is not the issue, but rather the evidence and proof therein." *Id*. at 4–5. Ms. Wilson also asserts that Ms. Wilson and Mr. Freeman share similar employment history, but argues that "prior work history is immaterial for the purposes of establishing a similar employment situation." *Id*. at 5–6. Finally, Ms. Wilson asserts that she and Mr. Freeman "were under the supervision of Sheriff Mike Hale and were subject to the same policies and guidelines during their employment with the JCSO." *Id*. at 6. Ms. Wilson does not point to any evidence in support of any of these assertions. *See id*.

Ms. Wilson fails to establish a *prima facie* case for three reasons. *First*, Ms. Wilson fails to establish that she and Mr. Freeman participated in the same basic misconduct. *Lewis*, 918 F.3d at 1227–28. Undisputed evidence establishes that the investigated misconduct leading to Mr. Freeman's resignation was that he intentionally and repeatedly shoplifted goods from a Wal-Mart store and "used [his] marked county issued patrol vehicle to transport the goods after the thefts." Doc. 35-1 ¶ 13; Doc. 35-18 at 2; Doc. 35-19 at 2. Undisputed evidence establishes that the investigated misconduct leading to Ms. Wilson's resignation was that she

"participated in the service of a [Protection From Abuse Order] in which [she] had a personal friendship with the complainant," then later "made [f]alse [s]tatements . . . during the [a]dministrative [i]nvestigation." Doc. 35-1 ¶¶ 9–10; Doc. 35-10 at 7; Doc. 35-12 at 2.

Ms. Wilson argues that *Palmer v. Masonite Corp.*, No. 6:19-cv-00219-LSC, 2020 WL 3051240 (N.D. Ala. June 8, 2020) supports a finding that evidence of misconduct by both the plaintiff and her comparator is sufficient, even if such misconduct was not the same, but this argument fails. In *Palmer*, the court applied the *Lewis* standard and held that the plaintiff failed to establish a *prima facie* case of discrimination because, among other reasons, the plaintiff failed to present any evidence showing that the proffered comparator engaged in the same basic misconduct as the plaintiff. *Id.* at *7.

Here, unlike in *Palmer*, the evidence establishes that the misconduct underlying the investigations and resignations of Ms. Wilson and Mr. Freeman was not the same—Mr. Freeman shoplifted and transported the goods in his patrol car, and Ms. Wilson improperly participated in the service of a Protection From Abuse Order and made false statements in the subsequent investigation. *See* Doc. 35-1 at 3–4; Doc. 36-10 at 7; Doc. 35-12 at 2; Doc. 35-18 at 2; Doc. 35-19 at 2. Accordingly, Ms. Wilson has not established that she and Mr. Freeman participated in the same basic misconduct leading to their separate resignations from JCSO. *Lewis*, 918 F.3d

21

at 1227–28. Indeed, Ms. Wilson expressly concedes that "[Ms.] Wilson and [Deputy] Freeman did not engage in the same misconduct." Doc. 38 at 4.

*Second*, as Sheriff Pettway correctly observes, Ms. Wilson and Mr. Freeman "do not share a similar employment and disciplinary history." Doc. 37 at 11. Specifically, Sheriff Pettway asserts that Mr. Freeman was employed with JCSO for eighteen years,[2] and Ms. Wilson was employed with JCSO for eleven years. *Id.*; Doc. 35-2 at 2; 35-12 at 2; Doc. 35-16 at 2; 35-19 at 2. Further, Sheriff Pettway asserts that Mr. Freeman received one other disciplinary charge before the misconduct leading to his resignation: "a 2009 violation for failure to complete a report for which he received a counseling reprimand." Doc. 37 at 11; Doc. 35-1 at 4–5; Doc. 35-17 at 2–3. In contrast, Sheriff Pettway asserts that Ms. Wilson "had multiple disciplinary charges" before the misconduct leading to her resignation, including but not limited to "two violations for leaving her assigned beat," and multiple incidents of making false statements during investigations, which misconduct resulted in five separate suspensions. Doc. 35-3; Doc. 37 at 11–12.

Ms. Wilson suggests that she and Mr. Freeman share the same employment history because they were both "employed by the JCSO for over ten years" and "held the title of Deputy Sheriff." Doc. 38 at 5; Doc. 35-2 at 2; 35-12 at 2; Doc. 35-16 at

---

[2] The court's review of the records indicates that Deputy Freeman was employed by JCSO for a little over seventeen years. *See* Doc. 35-16 at 2 ("Mr. Joshua DeWayne Freeman has been employed in the position of Deputy Sheriff, effective December 16, 1997."); Doc. 35-19 at 2 (indicating that Deputy Freeman resigned on March 4, 2015).

2; 35-19 at 2. Ms. Wilson argues, without citing any legal support, that her "prior work history is immaterial for the purposes of establishing a similar employment situation between" Mr. Freeman and herself. Doc. 38 at 6. Further, Ms. Wilson does not contest Sheriff Pettway's assertion that her disciplinary history is different from Mr. Freeman's disciplinary history. *See id.*

In support of his assertion that Ms. Wilson's and Mr. Freeman's employment and disciplinary history is significantly dissimilar, Sheriff Pettway cites *Hester v. University of Alabama Birmingham Hospital*, 798 F. App'x 453, 457 (11th Cir. 2020). In *Hester*, the court found that the plaintiff and his proffered comparator "did not share a similar employment history." *Id.* Specifically, the court observed that a "key difference in their employment histories" was that plaintiff's made false statements to his employer about his misconduct, which statements were part of the reasons why the plaintiff was terminated, but the comparator "never gave any statement, false or not, about his alleged misconduct." *Id.* Like in *Hester*, Ms. Wilson's resignation was in response to the JSCO taking disciplinary action against her in part because she made false statements about her misconduct, *see* Doc. 35-10 at 7–9, and she does not point to any evidence that Mr. Freeman made any statements, let alone false statements, about his misconduct, *see* Doc. 35-1 ¶ 14 ("[Mr.] Freeman had . . . no instances of false statements.").

Although Ms. Wilson and Mr. Freeman were both employed as Deputy Sheriffs by the JCSO for over ten years, their employment and disciplinary histories contain significant dissimilarities. Mr. Freeman was employed with JCSO approximately seven years longer than Ms. Wilson. Doc. 37 at 11; Doc. 35-2 at 2; 35-12 at 2; Doc. 35-16 at 2; 35-19 at 2. Further, Ms. Wilson received significantly more disciplinary actions than Mr. Freeman. Mr. Freeman received two disciplinary actions during his time at the JCSO: (1) in 2009, he "fail[ed] to complete a report for which he received a counseling reprimand," Doc. 37 at 11; *see also* Doc. 35-1 at 4–5; Doc. 35-17 at 2–3, and (2) in 2015, he "engaged in an intentional, systematic and repeated theft of goods from [a] Wal-Mart" and "used [his] marked county issued patrol vehicle to transport the goods after the thefts," which conduct lead to his resignation, Doc. 35-18 at 2; *see also* Doc. 35-1 at 4–5; Doc. 35-19 at 2. Ms. Wilson received "multiple disciplinary charges" during her time at the JCSO: (1) in 2008, she was "involved in a verbal confrontation and physical altercation with two other deputies while on duty," for which conduct she received a five-day suspension without pay, Doc. 35-1 ¶ 5; Doc. 35-3; Doc. 35-4 at 2–12; Doc. 37 at 11, (2) in 2010, she was suspended "on four additional occasions . . . for misconduct . . . involv[ing] . . . making false statements during the investigation of her actions," Doc. 35-1 ¶ 6; Doc. 35-3; Doc. 35-5 at 2–6; Doc. 35-6 at 2–6; Doc. 35-7 at 2–7; Doc. 35-8 at 2–5, (3) in 2013, she "came under investigation twice for lying," but "both investigations

were closed without termination," Doc. 35-1 ¶ 7; Doc. 35-3; Doc. 35-9 at 2–8; Doc. 35-10 at 1–10, and (4) in 2016, she participated in serving a Protection From Abuse Order for a complainant with whom she had a personal friendship and made false statements during the subsequent investigation, which conduct lead to her resignation, Doc. 35-3; Doc. 35-10 at 1–10; Doc. 35-12 at 2; Doc. 37 at 10–11. Accordingly, Ms. Wilson has not established that she and Mr. Freeman shared the same employment and disciplinary history at the JCSO. *See Lewis*, 918 F.3d at 1227–28.

*Third*, Ms. Wilson fails to establish that she and Mr. Freeman were subject to the same policies, guidelines, or rules in connection with the disciplinary actions that lead to their separate resignations from the JCSO.  Ms. Wilson makes the conclusory assertion, without pointing to any evidence, that she and Mr. Freeman "were subject to the same policies and guidelines during their employment with the JCSO." Doc. 38 at 6.

The undisputed record reflects that, in the 2016 disciplinary action leading to Ms. Wilson's resignation, she was found to be "in violation of the following [JCSO] Policies and Procedures:" 4-01.20(K) & (M); 4-02.60; 4-02.65; and 4-03.10. Doc. 35-10 at 7–8. Further, Ms. Wilson was found to be "in violation of the following [PBJC] Rules and Regulations:" 12.2(c), (g), (l) & (n). *Id.* at 8–9. The undisputed record also reflects that, in the 2015 disciplinary action leading to Mr. Freeman's

resignation, he was found to be "in violation of the following [JCSO] Policies and Procedures:" 4-01.05; 4-01.10; 4-01.20(K) & (U); and 4-03.20. Doc. 35-18 at 2–3. Mr. Freeman was also found to be "in violation of the following [PBJC] Rules and Regulations:" 12.2(b), (c), (l), (m) & (p). *Id*. at 3.

Of the nine policies of which Ms. Wilson was found to be in violation, Mr. Freeman was found to be in violation of only three of those same policies—4-01.20(K), 12.2(c) & (l). Accordingly, at least six of the policies Ms. Wilson was subjected to in response to the misconduct leading to her resignation are not the same policies applied to Mr. Freeman following his misconduct.

Accordingly, Ms. Wilson has not met her initial burden of establishing that she and her proffered comparator, Mr. Freeman, are "'similarly situated in all material respects,'" *Lewis*, 918 F.3d at 1229, and Sheriff Pettway's motion for summary judgment against Ms. Wilson's Title VII claim is **GRANTED**.

## IV.   CONCLUSION

For the foregoing reasons, Sheriff Pettway established "that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, Sheriff Pettway's Motion for Summary Judgment, Doc. 35, is **GRANTED**.

**DONE** and **ORDERED** this 14th day of February, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE